(No. 76618.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. DeWAYNE C. BRITZ, Appellant.

*Opinion filed October 18, 1996.—Rehearing denied December 2, 1996.*

HARRISON, J., specially concurring.

Richard D. Frazier, of Metnick, Wise, Cherry & Frazier, of Springfield, for appellant.

James E. Ryan, Attorney General, and Patrick Kelley, State's Attorney, both of Springfield (Barbara A. Preiner, Solicitor General, and Arleen C. Anderson and

Michael A. Hurst, Assistant Attorneys General, of Chicago, of counsel), for the People.

JUSTICE FREEMAN delivered the opinion of the court:

In 1985, petitioner, DeWayne C. Britz, was charged by information in Sangamon County with murder, aggravated kidnapping, aggravated criminal sexual assault, armed robbery, theft and concealment of a homicidal death. Following a jury trial, petitioner was convicted of all charges and sentenced to death. This court affirmed petitioner's conviction and sentence on direct appeal. *People v. Britz*, 123 Ill. 2d 446 (1988). The United States Supreme Court later denied petitioner's writ of *certiorari*. *Britz v. Illinois*, 489 U.S. 1044, 103 L. Ed. 2d 242, 109 S. Ct. 1100 (1989).

Petitioner subsequently filed a *pro se* petition under the Post-Conviction Hearing Act in the circuit court of Sangamon County. See Ill. Rev. Stat. 1985, ch. 38, par. 122—1 *et seq*. After being twice amended, the petition was dismissed by the trial court without an evidentiary hearing. Petitioner now appeals from the dismissal pursuant to Supreme Court Rule 651. 134 Ill. 2d R. 651. Based on the following considerations, we affirm.

## ISSUES

Petitioner raises essentially four issues on appeal: (1) whether at trial he was denied the effective assistance of counsel guaranteed under the sixth amendment (U.S. Const., amend. VI); (2) whether he was denied this same right at sentencing; (3) whether he made a substantial showing that the right was violated such that he was entitled to an evidentiary hearing; and (4) whether fundamental fairness and the orderly administration of justice require that a fitness hearing be held to determine if medication he was taking one month prior to the commencement of trial affected his defense.

## STANDARD OF REVIEW

On review of matters decided under the Post-Conviction Hearing Act, determinations of the trial court will not be disturbed unless manifestly erroneous. See *People v. Whitehead*, 169 Ill. 2d 355 (1996); *People v. Silagy*, 116 Ill. 2d 357, 365 (1987).

## BACKGROUND

At trial, the State presented essentially the following evidence. On January 16, 1985, petitioner struck his former employer in the head with a pistol in an attempt to rob him and then drove off with the employer's truck. Petitioner later kidnapped, sexually assaulted and fatally shot Mimi C. Covert. Covert had offered petitioner a ride after his employer's truck stalled on the highway.

After committing the crimes, petitioner purchased a 12-pack of beer and a half-pint of whiskey and drove to a motel where he checked into a room and fell asleep. Pursuant to their investigation, police later arrived at the motel, questioned petitioner and placed him under arrest. A police search yielded Covert's fishing license, her car keys, and the murder weapon. After petitioner was taken into custody, he gave police a statement, informing them where Covert's body could be found.

Police officers and the motel clerk testified that, shortly after the crimes, petitioner had not appeared to be under the influence of either alcohol or drugs. Petitioner's former employer testified also that he had observed petitioner throughout the course of the day prior to the crime, and petitioner had not appeared to be under the influence of either alcohol or narcotics.

Petitioner's statement to police that he had committed the crimes and left Covert's body on the side of a road was introduced into evidence. A witness, who had been housed previously with petitioner in the Sangamon County jail, also testified that petitioner had admit-

ted to him that he had murdered and raped Covert, and consumed only two beers but no drugs on the night of the murder.

Defendant attempted to present three expert witnesses to raise an "insanity defense based upon a chronic disease predicated on the voluntary ingestion of alcohol or drugs." *Britz*, 123 Ill. 2d at 457. The State, however, filed a motion *in limine* to prevent the three experts from testifying because their reports contained plaintiff's self-serving hearsay statements regarding the type and quantity of drugs and alcohol he had consumed on the night of the crimes.

Following a hearing, the trial court ruled that the experts could only testify to any conclusions they reached through objective testing; any opinions based on defendant's statements to them would be inadmissible. After objecting, defense counsel presented an offer of proof regarding the proposed testimony of the expert witnesses. *Britz*, 123 Ill. 2d at 458-60.

The offer of proof showed that Dr. Leslie Fyans, a psychologist, would have testified that petitioner suffered from both a "long-standing chronic" substance abuse disorder and a borderline personality disorder. Fyans opined that based on these mental defects, petitioner would have been unable to conform his conduct to the constraints of the law on the night of the crimes. See Ill. Rev. Stat. 1985, ch. 38, par. 6—2(a). Fyans drew these conclusions after administering objective assessment tests to petitioner and learning his version of the incident and his history of chronic substance abuse. *Britz*, 123 Ill. 2d at 458-59.

Petitioner also offered the testimony of Joan Stockhoff, a clinical pharmacist, and Dr. Thomas Mulry, a specialist in chemical dependency. Stockhoff would have testified that under the direction of Dr. Mulry, she conducted a drug-history interview with petitioner and

learned from him that he had a history of substance abuse. Mulry would have testified that he reviewed Stockhoff's report and interviewed petitioner. Based upon this information, Mulry formed the opinion that petitioner was chemically dependent and alcoholic, that his dependency was chronic and permanent, that he was intoxicated on the night of the crimes and possibly could have had periods of loss of control as well as periods of control. *Britz*, 123 Ill. 2d at 459-60.

The trial court again ruled that the experts' opinion testimony was inadmissible "if based in material part" on his statements to them regarding his drug and alcohol history and his ingestion of chemicals on the night of the crimes. *Britz*, 123 Ill. 2d at 459-60. As a result, none of petitioner's three expert witnesses testified during the guilt or innocence phase of trial. Petitioner presented, however, five witnesses who testified regarding his use of alcohol and drugs prior to the incident and the observed effect of those chemicals on him. The trial court gave the jury no insanity instruction, finding that no evidence of insanity had been shown. Petitioner was ultimately convicted of all charges and found eligible for the death penalty.

During the mitigation phase of sentencing, petitioner's three experts and two family members testified. The three experts testified substantially similarly to their testimony presented in the offer of proof. Defense counsel, however, did not ask Dr. Fyans to state an opinion regarding whether petitioner suffered from an extreme emotional or mental disturbance at the time of the murder. Defense counsel also did not ask Fyans to explain substance abuse and borderline personality disorders to the jury.

The State presented the testimony of Dr. Philip Bornstein, a psychiatrist, and Kenneth Imhoff, a clinical psychologist, in rebuttal. Based on their examinations of

petitioner, a review of police reports, the report of an associate, petitioner's statement, and newspaper reports, they testified that petitioner was not suffering from a mental or emotional disturbance at the time of the crime. Bornstein also testified that in his opinion petitioner was not intoxicated, mentally retarded or suffering from a mental disease or defect at the time of the crimes. Bornstein agreed with Fyans that petitioner suffered from a personality disorder, but he defined it as antisocial.

During argument, the prosecutor specifically drew attention to the fact that the statutory mitigating factor of commission of the crime under extreme mental or emotional disturbance was not shown by petitioner's evidence, but was negated by the State's evidence.

Following deliberations, the jury found no mitigating factors sufficient to preclude the imposition of death, and petitioner was sentenced to death.

On direct appeal, an issue was raised concerning the admissibility of petitioner's three expert witnesses' testimony. This court ruled that the testimony was properly excluded by the trial court because the experts did not rely on any reports regarding the issue of his sanity, save petitioner's statements to them. *Britz*, 123 Ill. 2d at 462-63.

After filing a *pro se* petition in 1989, petitioner filed an amended petition for post-conviction relief and appointment of counsel in 1992. In June 1993, petitioner filed a second-amended petition for post-conviction relief. Petitioner alleged that trial counsel was ineffective for failing to provide his experts with independent evidence to support the experts' opinions at trial and sentencing. Petitioner also alleged that trial counsel was ineffective for failing to elicit an opinion from Fyans that petitioner suffered from an extreme mental or emotional disturbance and failing to ask Fyans to explain borderline personality and substance abuse disorders to the jury.

Included with the petition were documents pertaining to petitioner's history of drug abuse and treatment and Illinois Department of Corrections records pertaining to this offense. Also included were affidavits from Dr. William Kip Hillman, a clinical psychologist, and petitioner's mother and sister.

Subsequent to the filing of the petition, the trial court directed petitioner's counsel to depose petitioner's trial counsel, Mike Vonnahmen and Jim Pappas, and his primary psychological expert, Dr. Fyans. Following a review of the petition and this information, the trial court found, *inter alia*, that the failure of trial counsel to provide corroboration of petitioner's drug usage history to the experts did not prejudice the defense; and that the sentencing result was unlikely to have been any different even if trial counsel had presented the indicated mitigation evidence. The trial court accordingly dismissed the second-amended petition. Petitioner filed a motion for reconsideration which included affidavits from one of his former high school teachers and two high school administrators. The trial court denied the motion for reconsideration. This appeal followed.

## ANALYSIS

### I. Ineffective Assistance of Trial Counsel During Guilt-Innocence Phase

The Post-Conviction Hearing Act (Ill. Rev. Stat. 1989, ch. 38, par. 122—1 *et seq.*) provides a remedy to criminal defendants who claim that substantial violations of constitutional rights occurred in their trial. A proceeding under the Act is not an appeal, but a collateral attack on a prior conviction and sentence. *People v. Mahaffey*, 165 Ill. 2d 445, 452 (1995). The purpose of the proceeding is to permit inquiry into constitutional issues involved in the original conviction that have not already been adjudicated or could have been. *Whitehead*, 169 Ill. 2d at 370.

Petitioner contends that he was denied the effective assistance of counsel guaranteed by the sixth amendment at trial. Petitioner claims that trial counsel was ineffective for failing to provide his experts with corroborating data to support their opinions at trial.

During his deposition at the post-conviction stage, Jim Pappas, one of petitioner's trial attorneys, testified that trial counsel knew prior to trial about the importance and necessity of providing corroborative documentation to buttress expert witnesses' testimony. Pappas testified that both he and Mike Vonnahmen, petitioner's other trial attorney, believed that it was doubtful that the insanity instruction would be given by the trial court because Fyans' opinion was based solely upon petitioner's statements. Pappas could not recall, but he believed that Vonnahmen had subpoenaed any available records. Pappas also believed that Vonnahmen had talked to petitioner's relatives and investigated any "past problems" that petitioner had.

During his deposition, Vonnahmen confirmed Pappas' recollection. Vonnahmen testified that he conducted no investigation to locate information that would corroborate expert opinion that petitioner suffered from a disorder. Vonnahmen acknowledged that, although he knew petitioner had a prior criminal record and had been incarcerated, he did not subpoena any related documents or any hospital, psychiatric or psychological records. Vonnahmen also acknowledged that he did not obtain the following specific documentation which was included with the post-conviction petition:

(a) a police report and hospital admission report dated May 30, 1980, stating that petitioner was found on a highway suffering from an apparent drug overdose from glue, possibly "speed" and other controlled substances;

(b) a hospital report dated August 2, 1980, which indicated that petitioner consumed various drugs;

(c) court records from an unrelated 1980 case, indicat-

ing that pursuant to court order, petitioner was evaluated by Treatment Alternatives to Street Crimes (T.A.S.C.) to determine whether he was a drug addict, that he had a history of substance abuse, and was subsequently determined to be a drug addict displaying a "[c]lassic poly-drug abuse pattern [*sic*] anything and everything";

(d) additional records, indicating that petitioner received probation conditioned upon successful completion of a T.A.S.C. residential drug treatment program;

(e) T.A.S.C. records indicating that petitioner suffered from family and living situation problems, had lost self-respect, felt insecure and relied on drugs for support;

(f) Department of Corrections records indicating that between November 1, 1982, and June 7, 1983, petitioner underwent five psychiatric evaluations, and stating, in September 1985, that he had "[m]ental/[p]syche" problems and was suicidal from 1979 to 1984.

Dr. Fyans was shown these documents during his deposition. Fyans testified that if the documents had been provided to him by trial counsel before petitioner's trial in 1985, he would have relied on the documents to support his opinion that petitioner suffered from substance abuse and borderline personality disorders at the time of the crimes.

The State responds initially that this claim is waived for failure to raise it on direct appeal. According to the State, the trial court's ruling, precluding the experts' opinion testimony at trial, was based on the lack of any independent bases for their opinions, which was apparent at trial.

The State additionally argues that the evidentiary basis for the claim was not only available, but was, in part, before this court on direct appeal. The State directs attention to this court's statement on direct appeal that one of petitioner's experts had not reviewed documentation memorializing petitioner's drug rehabilitation history. See *Britz*, 123 Ill. 2d at 459, 461-62. The State contends that *Britz* also referred to petitioner's taped

statements to police, his treatment in a drug rehabilitation center, and the "observations and statements" of petitioner's friends and family, including that of his sister, who testified at trial that petitioner used alcohol and marijuana every day for at least a year prior to the crimes. See *Britz*, 123 Ill. 2d at 455-56, 459-62. According to the State, the legal and evidentiary bases for the claim were thus apparent at the time of the direct appeal.

It is well established that determinations of the reviewing court on direct appeal are *res judicata* as to issues actually decided and issues that could have been presented on the direct appeal, but were not, are deemed waived. See *People v. Albanese*, 125 Ill. 2d 100, 105 (1988); *Silagy*, 116 Ill. 2d at 365; *People v. French*, 46 Ill. 2d 104 (1970). Application of the waiver rule is relaxed, however, in instances where the facts relating to the claim do not appear on the face of the original appellate record and could not have been supplemented to that record under Supreme Court Rule 329. *Whitehead*, 169 Ill. 2d at 372. As a matter of clarification, it is not so much that such a claim "could not have been presented" or "raised" on direct appeal, but rather that such a claim was incapable of being considered by the reviewing court because the claim's evidentiary basis was *de hors* the record. *Whitehead*, 169 Ill. 2d at 372. The exception recognizes that the rule of waiver ought not preclude such claims. *Whitehead*, 169 Ill. 2d at 372.

The trial record was not made a part of the record in this post-conviction appeal. However, according to the trial court's order dismissing the second-amended post-conviction petition, the following testimony was presented during the mitigation phase at sentencing. Petitioner's mother testified that when petitioner was a teenager she noticed that he was developing a problem with alcohol and drugs. According to petitioner's

mother, at that time, his main problem was glue sniffing. She testified that she had taken him to three different drug treatment facilities—T.A.S.C., Ryerson Center, and Gateway Foundation— where he resided for several weeks. She also testified that five years earlier, petitioner had been hospitalized for attempting to commit suicide by smoking marijuana and taking pills. She further related that the main drug petitioner used at the age of 13 was marijuana. Petitioner's mother additionally testified that petitioner acted fine when he was not on drugs, but acted "very, very strange" when he was on drugs.

Petitioner's sister testified also at sentencing that she was aware that her family had sought professional help for petitioner when he was a teenager and that they had taken him to Phoenix 7 (an out-patient facility), T.A.S.C., and Gateway. She testified that petitioner was aggressive when on drugs and calm when he was not.

Based on our review of the record, it is clear that the claim that trial counsel failed to provide corroborative data to support the experts' opinions at trial was one which could have been presented and considered on direct appeal.

First, the direct appeal opinion reflects that the alleged deficiency, itself, was clearly apparent at that time. Second, the trial court record includes evidence of several available independent corroborative bases on which the experts could have relied. Petitioner's mother and sister both testified at sentencing, indicating that they, themselves, were aware that petitioner had a significant history of substance abuse and drug rehabilitation treatment. Petitioner's mother and sister also testified to petitioner's "very strange" and aggressive behavior while under the influence of drugs, and apparently normal behavior when not. Moreover, they both

testified, naming several known drug treatment facilities where petitioner had been previously taken.

Indeed, on direct appeal, this court noted several possible corroborative bases, which were not relied on by the experts, namely police reports, witness reports, reports from the rehabilitative center or centers at which petitioner allegedly received treatment, and discussions with petitioner's friends and family. *Britz*, 123 Ill. 2d at 461-62.

Petitioner's claim that trial counsel failed to provide corroboration of the experts' opinions that he suffered from a substance abuse disorder, a borderline personality disorder and was chemically dependent does not depend on the documentation that he included with his post-conviction petition. Such claim rather depends on evidence that there were independent corroborative bases on which the experts could have relied had trial counsel so provided. Such evidence appeared within the record on direct appeal and therefore could have supported the claim that trial counsel was ineffective for failing to provide corroborative bases.

This is not a different or more meritorious ineffectiveness claim because of information showing that there were additional or stronger corroborative bases on which the experts could have relied. Admissibility of the experts' opinion at trial turned on whether there was *any* basis supporting those opinions besides petitioner's statements. This is not a case like *People v. Orange*, 168 Ill. 2d 138, 158 (1995), where the additional information impacted on the merits of the claim. Nor is this a case like *People v. Holman*, 164 Ill. 2d 356 (1995), where an argument different from that raised on direct appeal was presented with supporting mitigation evidence which was not part of the record on direct appeal. Neither is this case like *People v. Eddmonds*, 143 Ill. 2d 501, 528 (1991), where the same claim was made on

direct appeal, but depended on evidence not found within the trial record.

We do not mean to suggest that conjectural information regarding any independent corroborative bases would have sufficed on direct appeal. On the record here, however, it is shown that there were independent corroborative bases on which the experts could have relied so that their opinions could have been admitted if trial counsel had provided those bases. We conclude that trial counsel's failure in this regard was apparent from the trial record and the issue could have been considered on direct appeal. The claim was therefore waived.

## II. Ineffective Assistance at Sentencing

### A

Petitioner argues first that trial counsel failed to conduct a meaningful mitigation investigation. Petitioner specifically argues that trial counsel failed to provide the three experts with information to buttress their opinions at sentencing that he suffered from a borderline personality disorder and a substance abuse disorder.

In support of this argument, petitioner points out that cross-examination of his expert witnesses focused primarily on the fact that their opinions were based solely on petitioner's statements. Under cross-examination, Fyans was forced to acknowledge that if petitioner had not told him the truth about his drug abuse history, Fyans' opinion regarding a psychiatric disorder would change. During closing argument, the State was also able to attack the opinion evidence on the basis that it relied solely on petitioner's statements which were self-serving and unreliable.

Petitioner supports this claim with the same documents which supported the previous claim. As mentioned previously, the affidavits of petitioner's mother

and sister were included with the petition. Affidavits from one of petitioner's former high school teachers and two school administrators were included with petitioner's motion for reconsideration.

Petitioner's mother stated in her affidavit that trial counsel spoke with her only two or three times and spent no more than 20 minutes discussing with her the anticipated mitigation testimony. She stated that, if she had been asked by counsel, she could have testified that petitioner experienced a troubled adolescence and childhood, including that his father drank heavily. Petitioner's sister made similar statements in her affidavit, and included that she had once dropped petitioner on his head when he was an infant. Hospital records concerning that incident were included with the petition, but no permanent injury was indicated. Petitioner's former teacher stated in her affidavit that petitioner had been a "learning disabled" student while in high school. If she had been asked, petitioner's former teacher would have testified that she had been attached to him because he had always been helpful to and respectful of her. The two school administrators attested to the fact that petitioner was enrolled in special educational needs classes in high school, and records to that effect had been available at the time of his trial, but were subsequently destroyed.

Attorney Vonnahmen acknowledged during his deposition that he did not investigate mitigation sources other than petitioner's mother and sister and the three expert witnesses.

The State initially responds that this claim is waived for failure to raise it on direct appeal. The State contends that trial counsel's failure to provide information to buttress the expert's testimony at sentencing was apparent from the trial court record of proceedings. We disagree.

Unlike trial counsel's alleged failure to provide corroborative information for the expert witnesses for trial, trial counsel's allegedly similar failure at sentencing did not result in any exclusion of their testimony. Petitioner claims that the alleged failure instead exposed the experts' testimony to serious attack under cross-examination. This ineffectiveness claim thus depends on corroborative information which would have blunted or prevented the attack. Unlike the trial-phase-ineffectiveness claim, which depended on information, apparent from the record, showing that trial counsel could have in fact provided an independent corroborative basis for the experts' opinions, this claim depends on information which, qualitatively, could have supported the experts' opinions. Such information is not apparent of record, but was included with the post-conviction petition. Accordingly, we find that the claim was not waived for failure to raise it on direct appeal.

With respect to any general failure to conduct a sufficient mitigation investigation, we do not agree that this case compares to *People v. Perez*, 148 Ill. 2d 168 (1992), cited by petitioner. In *Perez*, the defense counsel possessed the defendant's school records, which revealed his mental deficiencies, his history of disruptive behavior and mitigating information about his family. Defense counsel did not introduce the records into evidence, or seek to have defendant's intelligence test results interpreted. Nor did defense counsel seek any independent expert testing of the defendant even though he was experiencing communications problems with him. Defense counsel did introduce a psychological report which was primarily damaging to defendant's case. An investigator enlisted by post-conviction counsel uncovered an abundance of additional mitigation information regarding defendant's dysfunctional family which defense counsel could have unearthed with the informa-

tion already in his possession. *Perez* held that counsel's investigative failures were objectively unreasonable and prejudicial to the defense so as to raise a serious doubt about the reliability of sentencing. *Perez*, 148 Ill. at 191, 194-95.

In the present case, trial counsel contacted two close family members of petitioner and discussed the subject of mitigation with them on several occasions. These two witnesses were presented by trial counsel at sentencing. They testified that petitioner had a history of substance abuse since adolescence, but that he could behave normally while not on drugs. In addition, trial counsel presented three expert witnesses, who had examined petitioner and administered to him a series of intelligence and psychological tests. These witnesses offered expert opinions that petitioner suffered from mental and substance abuse disorders, was an alcoholic and was chronically and permanently chemically dependent. Trial counsel's efforts to provide mitigation evidence here simply do not compare with the lack of assistance found in *Perez*.

Furthermore, the generally mitigating evidence, which petitioner contends should have been presented, was also either cumulative of that which was already introduced or of very little value. And while it may be that the documentative evidence would have provided additional support for the expert opinions, the evidence could have also undercut the mitigation strategy by revealing petitioner's lack of rehabilitative potential. See *Holman*, 164 Ill. 2d at 372 (noting that mitigation evidence can be double-edged). Moreover, some of the documentation petitioner included with his petition depended on petitioner's own relation of his substance abuse history in much the same manner as did the experts' opinions. Thus, the truth of petitioner's psychological condition was subject to prosecutorial attack

even if trial counsel had introduced these documents. Based on these considerations, it cannot be said that trial counsel's failure to obtain documentation in support of the experts' opinions was objectively unreasonable. Failure to present mitigating evidence at a capital sentencing hearing does not in itself prove that a defense attorney was ineffective. *Perez*, 148 Ill. 2d at 186. We hold that it was not shown that petitioner's sixth amendment right to effective counsel was violated.

B

Petitioner next argues that trial counsel failed to establish the mitigating factor of an "extreme mental or emotional disturbance" (Ill. Rev. Stat. 1985, ch. 38, par. 9—1(c)(2)), where that factor was the "only factor which could have precluded the imposition of the death penalty." Petitioner claims that trial counsel admitted in his deposition that he did not rely on this mitigating factor as evidence, but stated that he relied on a non-capital mitigating factor, "substantial grounds tending to excuse or justify" the criminal conduct "though failing to establish a defense" (Ill. Rev. Stat. 1985, ch. 38, par. 5—5—3.1(4)). Petitioner maintains trial counsel failed in this respect, despite that the prosecution presented expert opinion testimony negating such a disturbance and also emphasized this point in closing argument.

The State contends that this claim is waived because the only material, not part of the record on direct appeal, that petitioner now offers in support of this claim is trial counsel's acknowledgment that they did not request this information at sentencing. We disagree.

Petitioner supported this claim with Vonnahmen's deposition testimony regarding his performance during the mitigation phase at sentencing; Dr. Fyans' deposition testimony that, had he been asked, he would have testified that because petitioner suffered from a border-

line personality disorder, he also suffered from an extreme emotional disturbance; and the affidavit of Dr. William Kip Hillman, a clinical psychologist, wherein he concluded that, at the time of the offense, petitioner suffered from an extreme mental or emotional disturbance. We find that the claim depends on this information which was not apparent from the trial record. Thus, the claim was not waived.

The State first asserts that petitioner mischaracterizes the record. According to the State, trial counsel never expressed in his deposition that he did not rely on the mitigating factor of extreme emotional disturbance, and in fact he presented evidence at sentencing supporting that factor and specifically argued the factor in closing. According to the State, neither is this a case where trial counsel relied solely on one particular mitigating factor and then failed to prove or argue it. The State maintains that, once stripped of mischaracterization, petitioner's claim is no more than that trial counsel failed to elicit a statement from Dr. Fyans that petitioner suffered from an extreme emotional disturbance. The State insists such failure, given the totality of evidence presented and argued by trial counsel, cannot be said to have been objectively unreasonable.

The record shows that Dr. Fyans, Dr. Mulry, Joan Stockhoff, and petitioner's mother and sister testified at the sentencing hearing. The testimony of petitioner's mother and sister is recounted substantially above.

Stockhoff testified that she interviewed petitioner, and he related a substance abuse history, which included alcohol consumption, glue sniffing, and ingestion of "acid" and other pills. On the day of the crime, he took "acid," Valium, Placidyl, cocaine and alcohol. At the time, he had been drinking for several days.

Dr. Mulry testified that petitioner told him that on the day of the crime he had taken large quantities of

these same substances, and had been taking cocaine daily for the previous two weeks. Mulry explained the effect of these drugs and the concept of "tolerance" and expressed an opinion that petitioner had a high tolerance level. Mulry said that once petitioner had taken all these drugs, anything could happen. Mulry finally stated that in his opinion petitioner was permanently and chronically chemically dependent.

Dr. Fyans testified that he conducted a psychiatric examination of petitioner that involved seven interviews and testing. Fyans related petitioner's drug history and the substances he ingested on the date of the crimes. Fyans testified that petitioner had attempted suicide when he was 18 or 19 by taking Darvon and alcohol. He also testified that, in his opinion, petitioner suffered from a mental disease or disorder classified as an "Axis I Diagnosis of Substance Abuse Disorder" and an "Axis II Diagnosis of Borderline Personality Disorder." Fyans testified that the magnitude of the drugs consumed by petitioner was true and could have distorted his reasoning and judgment potential. Dr. Fyans stated that, at the time of the incident, petitioner's inhibitions could have been removed and he would have had almost a total lack of impulse control. In Fyans' view, petitioner would not have been in control to make judgments and realistic decisions leading up to the incident.

The prosecution presented the testimony of Dr. Philip Bornstein, who agreed that petitioner suffered from a personality disorder, but expressed the opinion that he did not suffer from an extreme mental or emotional disturbance. Dr. Imhoff also testified that his tests did not show that petitioner had an extreme mental or emotional disturbance.

In closing, the prosecution advised the jury that it would be instructed that mitigating factors which precluded the death penalty included commission of the

crime while under the influence of an extreme emotional disturbance and other facts and circumstances. The prosecutor emphasized that the defense had not presented expert testimony that petitioner was under such influence at the time of the crime and pointed out that the only witnesses who had been asked had said that the petitioner was not.

Referring to the factor of extreme mental or emotional disturbance, the prosecutor said, "Remember that that is one of the mitigating factors that the judge will instruct you on. That alleged mitigating factor has been negated by the evidence, so there is no factor sufficient to preclude the death penalty."

Trial counsel in closing also advised the jury that mitigating factors were any facts or circumstances, including extreme emotional disturbance, that provided reason to impose a sentence less than death. Trial counsel argued that both sides had presented experts who testified about petitioner's mental state at the time. Trial counsel warned the jury not to be misled by the State into believing that an extreme emotional disturbance was the only factor that it could consider and if resolved against petitioner, it should give him the death penalty. Trial counsel acknowledged such disturbance as a mitigating factor, but argued that petitioner did not have to prove it, as was suggested by the State, because "[a]ny facts or circumstances" could preclude the death penalty. Trial counsel referred repeatedly to a theme of "[a]ny facts or circumstances."

In preparation for his deposition during post-conviction proceedings, Vonnahmen read the sentencing hearing transcript from seven years previous, but not all parts of it. When asked to explain his mitigating strategy, Vonnahmen testified that his theory had been that petitioner was operating under the influence of drugs and alcohol at the time, and that he should not

receive the death penalty because of his age. Vonnahmen recalled that his approach had been to present altogether the evidence of petitioner's drug use, the experts' views on what that would mean, and testimony from petitioner's family to show he was not a "total loss." The thrust of the mitigation was to show petitioner's erratic behavior, and that when he was not on drugs he could be normal. Vonnahmen consistently indicated that he did not address mitigation by "break[ing] it down by every little section of the statute." He did not remember if there was any strategic reason why he did not ask Fyans to give an opinion regarding whether petitioner suffered from such an emotional disturbance.

When asked, Vonnahmen identified "substantial grounds to excuse" as a specific mitigating factor he had relied on and specifically identified no other. Vonnahmen, however, also identified any other mitigating factors as "whatever" he had argued. He agreed that an extreme emotional disturbance is a mitigating factor and appeared surprised to learn that he had in fact specifically argued extreme emotional disturbance in closing at sentencing.

Section 9—1(c)(2) of the Criminal Code of 1961 provides that the court shall instruct the jury to consider any mitigating factors relevant of the imposition of the death penalty, which may include, but need not be limited to, commission of the murder under the influence of extreme mental or emotional disturbance, though not such as to constitute a defense. Ill. Rev. Stat. 1983, ch. 38, par. 9—1(c)(2). Obviously, a jury may consider any facts or circumstances in mitigation under the statute, including a defendant's age and personal history (see *People v. Colon*, 69 Ill. App. 3d 1021 (1979)), so that commission under the influence of extreme mental or emotional disturbance is not the only mitigating factor which may preclude the death penalty.

In the present case, trial counsel approached mitigation by presenting evidence which, in general, concerned petitioner's psychological state prior to and during the crime, his personal history and age. A good deal of the evidence presented indicated that petitioner was emotionally disturbed at the time he committed the crimes. *Cf. People v. Madej*, 106 Ill. 2d 201, 221 (1985) (evidence that defendant "very hyper" or "like a maniac" allegedly indicative of factor). Defense and prosecution experts agreed that petitioner displayed a number of personality disorders from which it could be reasonably inferred that he suffered from some manner of emotional disturbance. Petitioner was shown also to suffer from permanent, chronic addiction and alcoholism. His sister also testified that he acted "very, very strange" when on drugs. Notably, the jury which heard the evidence at sentencing was the same jury that heard trial evidence that no more than a month before the crimes, petitioner fired guns from vehicle windows, drew his gun on a waitress, and pulled a knife on a fellow employee, threatening to kill him. The crime itself was senseless, and petitioner, himself, told police that he just went "real crazy" when he first shot Covert and saw her blood. Based on this record, it would be difficult not to conclude that there was a good deal of evidence presented indicating that petitioner was extremely emotionally disturbed at the time of the crime.

Furthermore, Vonnahmen testified that he approached mitigation by presenting the available evidence without differentiating between any possible statutory factors. His deposition reveals that he was aware that an extreme emotional disturbance is a mitigating factor, but also that he could not recall whether and to what extent he might have relied upon it at sentencing. Vonnahmen's statement that he relied on a noncapital mitigating factor must be viewed within

the context of his entire testimony which indicated an overall lack of memory regarding the details of petitioner's sentencing hearing.

In sum, the record shows that evidence of an extreme emotional disturbance was presented, along with other mitigating evidence, but that trial counsel did not elicit a specific opinion from Fyans on that point.

Against this backdrop, it cannot be said that a statement of opinion by Fyans that petitioner was under the influence of an extreme emotional disturbance at the time he committed the crimes was the only evidence which would have precluded the death penalty. An expert's pronouncement of his opinion to that effect would not have made the evidence of petitioner's disturbance more sufficient. Based on the evidence before the jury which was not considered sufficiently mitigating to preclude the death penalty, it is not reasonably likely that Fyans' opinion would have turned the tide in petitioner's favor. We conclude that no sixth amendment violation was shown by counsel's failure.

## C

Lastly, petitioner argues that trial counsel failed to ask Dr. Fyans to explain borderline personality and substance abuse disorders to the jury. Petitioner contends that if Fyans had been asked to testify as he had during the offer of proof or during his deposition, the jury would have received an explanation of how these defects mitigated petitioner's conduct in this offense.

The State contends that this claim was waived for failure to raise it on direct appeal. The State asserts that the only facts now offered by petitioner outside the trial record are trial counsel's acknowledgments that they failed to make such requests. According to the State, trial counsel's failure was apparent from the trial record, making the claim capable of consideration on direct appeal. We agree that the claim was waived.

Even assuming that Dr. Hillman's affidavit was offered as support for this claim, the claim could have been raised and considered on direct appeal. The fact that trial counsel did not request an explanation is apparent from the trial court record. And the offer of proof shows the response that Fyans could have provided if he had been asked to explain. Thus, the claim does not depend on the fact that trial counsel later admitted their failure, that if asked, Fyans would have testified as he did in the offer of proof, or that Hillman could respond similarly. Accordingly, we find that petitioner waived the claim for failing to raise it on direct appeal.

### III. Dismissal Without Evidentiary Hearing

Petitioner next claims that he made a substantial showing that his sixth amendment right was violated and, thus, the cause should be remanded for an evidentiary hearing. More specifically, petitioner claims that the allegations and supporting documents attached to his petition show that trial counsel failed to conduct an investigation into available mitigation information, and the record also shows counsel failed to elicit expert testimony that petitioner was suffering from an extreme emotional disturbance at the time of the offense. The State responds that petitioner is not so entitled.

A post-conviction petitioner is not entitled to an evidentiary hearing of his claims as a matter of right. Ill. Rev. Stat. 1989, ch. 38, par. 122—6; see *Whitehead*, 169 Ill. 2d at 370-71.

An evidentiary hearing should be conducted when the petitioner makes a " 'substantial showing of a violation of constitutional rights,' " which means that the petition's allegations must be supported by the record or by accompanying affidavits. *Whitehead*, 169 Ill. 2d at 371, quoting *People v. Silagy*, 116 Ill. 2d 357, 365 (1987). The burden is on the petitioner to establish a substantial deprivation of constitutional rights. See *Whitehead*, 169

Ill. 2d at 370. If the allegations and supporting documents were true and would establish a constitutional violation, the trial court must hold a hearing to determine the actual facts. *People v. Stepheny*, 46 Ill. 2d 153 (1970). Denial of an evidentiary hearing is a matter of discretion, and the trial court's discretion will not be reversed absent such an abuse. *Whitehead*, 169 Ill. 2d at 371.

As previously discussed, however, the allegations of trial counsel's particular failures and supporting documents, even accepted as true, would not establish constitutional violations.

Furthermore, petitioner's claim was that trial counsel failed to provide the three experts with documentative data to corroborate their opinions. Petitioner included that documentative data with his petition, and there was no issue concerning the information's evidentiary value or its trustworthiness. Thus, beyond the petition's allegations and its inclusions, there was no evidentiary issue for the trial court to explore with respect to the claim of trial counsel's claimed ineffectiveness at trial.

With respect to the sentencing phase, petitioner claimed that trial counsel failed to investigate and provide documentative evidence to support the expert witnesses' views that were based on petitioner's history of drug abuse and alcoholism. This mitigation evidence took the form of the "many documents" petitioner included with his petition. According to petitioner, "[t]his information was vital *** since it would have eliminated the prosecutions' primary argument that Mr. Britz was falsifying his drug history and level of intoxication on the day of the offense."

Petitioner's additional argument that trial counsel failed to elicit the expert opinion that he suffered from an extreme emotional disturbance at the time of the

crime also required no evidentiary hearing. Attorney Vonnahmen's and Dr. Fyans' post-conviction deposition transcripts and Dr. Hillman's affidavit were included with the petition, and there was no dispute regarding this evidence, so that the claim was properly decided on the pleadings.

In sum, the pleadings and attachments alone revealed no constitutional violations, and the trial court did not abuse its discretion by declining to conduct an evidentiary hearing.

### IV. Fitness Hearing

According to Illinois Department of Corrections records dated September 11, 1985, which was approximately one month prior to the commencement of trial, petitioner was referred to as "currently" on medication and the medication was "ordered." Somewhat illegible handwritten notes accompany these printed statements, apparently stating three types of medication and their treatment purposes. The purpose for one medication is stated as "nervous stomach." The purpose for a second medication is "blurred" or "blurring [v]ision." The third medication is clear, "Selsun lotion [d]aily."

In this appeal, for the first time, petitioner argues that he should be granted a fitness hearing to determine whether these medications which he was taking "under medical direction" interfered with his ability to present a defense. Petitioner claims that *People v. Brandon*, 162 Ill. 2d 450 (1994), and *People v. Gevas*, 166 Ill. 2d 461 (1995), mandate that the cause be remanded to the trial court for a fitness hearing. See Ill. Rev. Stat. 1983, ch. 38, par. 104—21(a).

Notably, petitioner makes no representation or suggestion that the medications he was taking were in fact psychotropic, similar to psychotropic, or mind-altering drugs. Neither does he dispute in any way the State's

assertions that he seeks remand for a fitness hearing because one month prior to trial he was using Mylanta for a nervous stomach and Selsun lotion as a topical solution. Nor does he present argument that such medications could have interfered with his ability to present a defense. Rather petitioner claims that the exact medications he was taking are unknown and given his Department intake records which indicate that he had been suicidal (from 1979 to 1984) and was "referred to PSYCH," "there is a very real possibility" that the medications could have been psychotropic drugs. Thus, in the alternative, petitioner requests a limited remand for the purpose of determining exactly what medication he was taking approximately one month prior to trial.

Although petitioner did not include this issue in his original or amended post-conviction petitions (see Ill. Rev. Stat. 1983, ch. 38, par. 122—3), or raise this issue in the trial court during post-conviction proceedings, he urges that we relax application of the waiver rule in the interests of "fundamental fairness" (*People v. Flores*, 153 Ill. 2d 264, 274 (1992)) and the maintenance of an "orderly administration of justice" (*People v. Davis*, 156 Ill. 2d 149, 160 (1993)).

In *People v. Hollins*, 51 Ill. 2d 68, 70 (1972), the procedural bar was relaxed on the basis of fundamental fairness where it appeared that post-conviction counsel had not made any effort to amend the *pro se* petition or argue issues other than the petition's timeliness. In *People v. Slaughter*, 39 Ill. 2d 278, 284-85 (1968), the bar was also relaxed on the same basis where the record unmistakably disclosed that post-conviction counsel had not provided effective assistance with respect to the original *pro se* petition and a motion to amend.

In the instant case, it appears that post-conviction counsel initially overlooked the statements in the Department records pertaining to petitioner's medica-

tion and failed to include that issue in the first- or second-amended petition. This failure is similar in scope and effect to those discussed in *Hollins* and *Slaughter.* In the interests of fundamental fairness, we will address the merits of this claim.

Section 104—21(a) of the Code of Criminal Procedure of 1963 provides in relevant part that:

"[a] defendant who is receiving psychotropic drugs or other medications under medical direction is entitled to a hearing on the issue of his fitness while under medication." Ill. Rev. Stat. 1983, ch. 38, par. 104—21(a).

*Brandon* construed the plain language of section 104—21(a) as providing defendants a legal right to a fitness hearing under the conditions specified within the provision. Given that entitlement and a defendant's expressed choice to exercise it, *Brandon* found that the decision to hold such a hearing was not a matter committed to the trial court's discretion. See *Brandon,* 162 Ill. 2d at 461. *Brandon* therefore found that defense counsel's failure to inform the court that the defendant was on psychotropic drugs satisfied the second prong of *Strickland v. Washington,* 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052 (1984). *Brandon* held that the defendant was entitled to a new trial for the failure to conduct a fitness hearing. See *Brandon,* 162 Ill. 2d at 459, 461.

*Gevas* applied *Brandon*'s construction of section 104—21(a), also recognizing that the conditions specified in the provision, "the administering of psychotropic medication," equated with a *bona fide* doubt as to fitness to stand trial. See *Gevas,* 166 Ill. 2d at 469. *Brandon* and *Gevas* were premised on the General Assembly's recognition that "psychotropic medication is an important signal that a defendant may not be competent to stand trial." *Brandon,* 162 Ill. 2d at 457; *Gevas,* 166 Ill. 2d at 468-69. Other cases that also dealt with the administration of psychotropic drugs followed. See *People v. Kinkead,* 168 Ill. 2d 394 (1995); *People v. Nitz,*

173 Ill. 2d 151 (1996); *People v. Birdsall*, 172 Ill. 2d 464 (1996). In each case, a showing of the administration of psychotropic drugs resulted in either remand for a new trial or a limited factual hearing to determine whether the court had a further duty to conduct a formal fitness hearing. We have noted also that no fitness hearing is required where the defendant's right to a fitness hearing pursuant to section 104—21(a) is not established, "as where there is no indication that defendant was being treated with psychotropic medication during the relevant times." *Kinkead*, 168 Ill. 2d at 411.

In the present case, the State argues that petitioner's claim is barred because he seeks to benefit from the retroactive application of a "new rule" announced by *Brandon*. Under the circumstances of this case, however, we need not decide whether the granting of a fitness hearing would be mandatory by application of *Brandon* or a matter of discretion under pre-*Brandon* case law (see *People v. Tilson*, 108 Ill. App. 3d 973 (1982); *People v. Balfour*, 148 Ill. App. 3d 215 (1986)). It must first be shown that petitioner comes within the purview of section 104—21(a). Based on his claim as stated, petitioner would apparently contend that section 104—21(a) encompasses the administering of medication for any treatment purposes or is triggered if the exact medication is unknown, but circumstances indicate it was possible that the medication was psychotropic.

Petitioner first claims that because he was taking "other medications under medical directions," a condition specified in section 104—21(a), he should receive a fitness hearing. We disagree.

The primary rule of statutory interpretation, to which all other rules are subordinate, is that a court should ascertain and give effect to the intent of the legislature. *Bonaguro v. County Officers Electoral Board*, 158 Ill. 2d 391, 397 (1994). In interpreting a statute, the

language used by the legislature must be given its plain and ordinary meaning. *Brandon*, 162 Ill. 2d at 460-61. The term "other medications under medical direction" within section 104—21(a), however, cannot be plainly understood. Reliance on statutory construction principles reveals that, under the doctrine of *ejusdem generis*, a specific provision, when followed by a general provision, as in section 104—21(a) is read to control the general when both relate to the same subject matter. *People v. Villarreal*, 152 Ill. 2d 368, 379 (1992). Furthermore, under the doctrine, when a statutory clause describes a class or classes of persons or things, and then includes "other" persons or things, as in "other medications under medical direction," following a specific reference, as in "psychotropic drugs," the word "other" is interpreted to mean "other such like." See *Coldwell Banker Residential Real Estate Services of Illinois, Inc. v. Clayton*, 105 Ill. 2d 389, 396 (1985); *People v. Lowey*, 271 Ill. App. 3d 929, 933-34 (1995); *People v. McBrien*, 144 Ill. App. 3d 489, 494-95 (1986). Thus, applying these principles, the general term "other medication" in section 104—21(a) must be interpreted as meaning other such like medication with reference to psychotropic drugs. See *People v. Eubanks*, Nos. 1—94—2285, 1—94—2754 (Ill. App. August 13, 1996).

This interpretation accords both with law and other construction principles. Section 104—21(a) provides that certain conditions entitle a defendant to a fitness hearing. Because fitness to stand trial refers to a defendant's ability "to understand the nature and purpose of the proceedings" against him or assist in his defense (*Kinkead*, 168 Ill. 2d at 407; 725 ILCS 5/104—10 (West 1992)), the legislature could only have intended that section 104—21(a) include medications capable of interfering with that ability. Psychotropic drugs are clearly capable of doing so. By "other medications under medi-

cal direction," the statute recognizes that other medications that have effects like psychotropic drugs are capable of doing so as well. Moreover, the legislature could not have intended an absurdity. Given the ultimate determination in a fitness hearing, it would be absurd for the administering of medications which do not interfere with a defendant's ability to understand and assist the defense to require such a hearing.

"Psychotropic medication[s]" are defined in the Mental Health and Developmental Disabilities Code as "medication whose use for antipsychotic, antidepressant, antimanic, antianxiety, behavioral modification or behavioral management purposes is listed in AMA Drug Evaluations, latest edition, or Physician's Desk Reference [PDR], latest edition, or which are administered for any of these purposes." 405 ILCS 5/1—121.1 (West Supp. 1995). The United States Supreme Court has also explained that psychotropic drugs are "medications commonly used in treating mental disorders such as schizophrenia," the effect of which is "to alter the chemical balance in the brain, the desired result being that the medication will assist the patient in organizing his or her thought processes and regaining a rational state of mind." *Washington v. Harper*, 494 U.S. 210, 214, 108 L. Ed. 2d 178, 193, 110 S. Ct. 1028, 1032 (1990).

Selsun lotion or the other medications petitioner was taking for a "nervous stomach" or for his "vision" do not approximate the category of psychotropic drugs described above which affect one's mind. We hold that defendant could not be entitled to a fitness hearing under section 104—21(a) on the basis that he was taking "other medication" which was like a psychotropic drug.

Additionally, on the basis of the record before us, we hold that petitioner would not be entitled to a limited remand to determine the names of two medications he was taking. The two medications were stated to be for a

nervous stomach and blurring or blurred vision. Contrary to petitioner's assertions, the Department's record does not indicate that he was then suicidal. These circumstances are not such to compel the conclusion that he was possibly taking psychotropic drugs. Petitioner's request for a fitness hearing or limited hearing is accordingly denied.

## CONCLUSION

We find that, based on the allegations within the second-amended post-conviction petition, petitioner was not denied the effective assistance of trial counsel at either trial or sentencing. Accordingly, we affirm the trial court's dismissal of the second-amended post-conviction petition.

The judgment of the circuit court of Sangamon County is affirmed. The clerk of this court is directed to enter an order setting Tuesday, January 21, 1997, as the date on which the sentence of death entered by the circuit court of Sangamon County shall be carried out. Defendant shall be executed in a manner provided by the law. 725 ILCS 5/119—5 (West 1992). The clerk of this court shall send a certified copy of the mandate in this case to the Director of Corrections, to the warden of Stateville Correctional Center, and to the warden of the institution where defendant is now confined.

*Affirmed.*

JUSTICE HARRISON, specially concurring:

I agree with the result reached by the majority, but write separately because I disagree with the reasoning employed by my colleagues in rejecting petitioner's *Brandon* claim.

In *People v. Brandon*, 162 Ill. 2d 450, 461 (1994), decided just two years ago, this court declared the language of section 104—21(a) of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1983, ch. 38, par. 104—

21(a)) to be clear and unambiguous. Now my colleagues have abruptly decided that a phrase in that statute, "other medications under medical direction," cannot be plainly understood. This contention is untenable. As with the remainder of the text, there is nothing the slightest bit confusing about this phrase. It is perfectly straightforward. "Other medications under medical direction" means simply medications, other than psychotropic drugs, taken under the direction of medical personnel.

Obviously unhappy with such a construction, my colleagues attempt to find refuge in Latin, invoking the phrase *ejusdem generis*. This phrase is a familiar one in law, but has nothing to do with this case. When used as a canon of statutory construction, *ejusdem generis* means that when a statute lists several classes of persons or things and is followed by a general reference supplementing the enumeration, the general words will be construed as applying only to "others such like" the enumerated persons or things (*Board of Trustees of Southern Illinois University v. Department of Human Rights*, 159 Ill. 2d 206, 211 (1994)), *i.e.*, persons or things of the same general class as those listed (Black's Law Dictionary 517 (6th ed. 1990)).

In this case, *ejusdem generis* is inapplicable for the obvious reason that there is no listing of several classes of persons or things followed by a general reference. While "other medication" may be general, it is not proceeded by the enumeration of several classes or persons or things. Only one item comes before it and that is "psychotropic drugs." Accordingly, the doctrine cannot support the majority's conclusion that "other medication" is limited in meaning to other medication like psychotropic drugs. "Psychotropic drugs" is an alternative to "other medication" and in no way qualifies that term.

The fallacy in the majority's position becomes further apparent when one considers how medication could possibly be psychotropic-like without qualifying as psychotropic itself. The basic definition of "psychotropic" is simply "acting on the mind" (Webster's Third New International Dictionary 1834 (1986)), and there is no statutory basis for assigning it anything more than this generic meaning. If medication affects one's mind, it is psychotropic under this definition. If it does not, it is not. There is no middle ground.

Because the specific term "psychotropic drugs" embraces the entire class of drugs that act on the mind, the general term "other medications" must be given a meaning beyond that class. Otherwise, the term would add nothing to the statute. It would be mere surplusage, thus violating the more important rule of construction that a statute should be construed so that no word or phrase is rendered superfluous or meaningless. See *In re Special Education Placement of Walker*, 165 Ill. App. 3d 846, 851 (1987), *rev'd on other grounds*, 131 Ill. 2d 300 (1989).

The majority asserts that construing the statute to require a fitness hearing even where the medication is not psychotropic or psychotropic-like would be absurd. This argument is based on a fundamental misunderstanding of the import of the statute. The idea behind the law is not that the medication itself is disabling, although it may be, but that the need for medication is indicative of the presence of an underlying condition which may prevent a defendant from being able to fully participate in his defense.

The General Assembly has expressly recognized that a defendant's ability to understand and assist the defense may be impaired by physical conditions as well as mental ones. See Ill. Rev. Stat. 1983, ch. 38, pars. 104—10, 104—13, 104—15, 104—17. If a defendant can-

not see because of vision problems, or cannot breathe because of respiratory ailments, or cannot concentrate because of fever, pain or other illness, his ability to defend himself may be every bit as compromised as a defendant who is depressed or delusional. The General Assembly included the "other medications" language in section 104—21(a) (Ill. Rev. Stat. 1983, ch. 38, par. 104—21(a)) to cover such physical conditions, just as it included the "psychotropic drug" language to cover mental conditions. The notion behind the statute is that whichever type of problem afflicts a defendant, if it is serious enough to require medication under medical direction, it is serious enough to warrant a hearing on his fitness. The type of medication is irrelevant. As long as it is taken under medical direction, a fitness hearing is necessary.

There is nothing inherently absurd or irrational about this arrangement. One may disagree with it as a matter of policy, but the policy judgment was for the legislature to make. I note, in this regard, that the legislature has now apparently concluded that its policy decision was unsound and has therefore amended the statute to delete the reference to "other medications." Pub. Act 89—428, eff. December 13, 1995 (amending 725 ILCS 5/104—21 (West 1994)). That amendment, however, is further proof that the majority's construction of the law is incorrect.

When the legislature amends an act by deleting certain language, there is a presumption that it intended to change the law in that respect. *Board of Trustees of Community College District No. 508 v. Burris*, 118 Ill. 2d 465, 475 (1987). If the majority were correct and "other medications" meant simply "other psychotropic-like medications," there would have been no need to change the law here. To the contrary, the amendment would have been completely nonsensical, because in terms of

assessing a defendant's fitness, there is no rational basis for differentiating drugs that are actually psychotropic from drugs that may not be psychotropic but have the same kinds of effects on a defendant's mind.

Although the majority has thus misinterpreted the statute, I nevertheless agree that the petitioner in this case is not entitled to a fitness hearing under *Brandon*, 162 Ill. 2d 450, and its progeny. The mere fact that a defendant has taken medication under medical direction at some point during the pendency of the case is not sufficient to trigger the requirements of section 104—21(a) (Ill. Rev. Stat. 1983, ch. 38, par. 104—21(a)). Administration of the medication must have been proximate in time to the trial or entry of a guilty plea and sentencing. See *People v. Kinkead*, 168 Ill. 2d 394, 414 (1995). That was not the case here. Petitioner took the medication approximately one month before the trial commenced, and there is no indication in the record that anything was occurring at the time, in terms of defense preparation, that required decisionmaking or assistance on his part. It is for this reason that the court is correct in rejecting petitioner's request for a fitness hearing.

In all other respects, I join in the majority's opinion.